# FAIRFAX CIRCUIT COURT
## CIVIL CASE COVERSHEET

**2020  01181**

**Parties:**

| Plaintiffs | Defendants |
|---|---|
| 1. Team Velocity Marketing, LLC | 1. Richard DeLancey |
| 2. | 2. |
| 3. | 3. |

*Plaintiff proceeding without Counsel – Address and Daytime Phone Number required on Complaint

**Plaintiff Attorney:**

Name: Paul J. Kennedy & Joon Hwang    Bar ID: 29802 & 82248

Firm: Littler Mendelson P.C.

Street: 1650 Tysons Blvd., Suite 700

City: Tysons Corner    State: VA    Zip: 22102

Phone Number: 703-442-8425    Fax Number: 703-442-8428

E-mail Address: PKennedy@littler.com, JHwang@littler.com

**Nature of Complaint (Check only one)**    *** Cases in the Civil Tracking Program**

| | | |
|---|---|---|
| Administrative Appeal | Defamation * | Malpractice – Medical * |
| Affirmation of Marriage | Delinquent Taxes * | Mechanics/Vendors Lien * |
| Aid & Guidance | Eminent Domain | Partition * |
| Appeal Decision of Board of Zoning | Encumber/Sell Real Estate | Personal Injury – Assault * |
| Appeal of Process/Judicial Appeal | Erroneous Assessments | Personal Injury – Auto * |
| Appointment Church/Organization Trustees | Expungement | Personal Injury – Emotional * |
| Arbitration | False Arrest/Imprisonment* | Personal Injury – Premises Liability* |
| Attachment | Fiduciary/Estate Complaint | Property Damage* |
| ✔ Complaint – Equity * | Garnishment–Federal–180 days | Products Liability* |
| ✔ Complaint – Legal Cause of Action * | Garnishment–Wage–180 days | Quiet Title * |
| Compromise Settlement | Garnishment–Other – 90 days | Real Estate * |
| Condemnation* | Guardian/Conservator Adult | Restoration of Driving Privilege |
| Confession of Judgment | Guardianship/Minor | Vital Record Correction |
| Construction * | ✔ Injunction | Writ Habeas Corpus |
| Contract * | Interpleader | Writ Mandamus |
| Conversion* | Insurance * | Wrongful Death* |
| Court Satisfaction of Judgment | Judicial Review | Wrongful Discharge * |
| Declare Death | Malicious Prosecution * | OTHER: |
| Declaratory Judgment * | Malpractice – Legal * | |

Damages in the amount of $ in excess of $25,000 are claimed.

**Requested Service:** Sheriff ☐  Private Process Server ☐  DMV ✔  Secretary of Commonwealth ☐  State Corporation Commission ☐  Publication ☐  No Service at this time ☐

CCR D-90 Civil Coversheet (Revised – October 2011)

**EXHIBIT**

1

VIRGINIA:

FILED
CIVIL INTAKE

2020 JAN 21 PH 4: 00

JOHN T. FREY
CLERK. CIRCUIT COURT
FAIRFAX, VA

IN THE CIRCUIT COURT FOR FAIRFAX COUNTY

TEAM VELOCITY MARKETING, LLC )
)
)
Plaintiff, )
)
v. )    Case No. __2 0 2 0__   __0 1 1 8 1__
)
RICHARD DELANCEY, )
8020 Clementine Lane )
Tampa, Florida 33625 )
)
Defendant. )

## VERIFIED COMPLAINT

Plaintiff Team Velocity Marketing, LLC d/b/a Level 5 ("Level 5" or the "Company"), by counsel, hereby submits this Verified Complaint against Defendant Richard DeLancey ("DeLancey"), and states:

## NATURE OF THE ACTION

1.      Level 5 is a full service provider of marketing and technology solutions to recreational vehicle ("RV"), marine and powersport dealerships throughout the United States. This action is brought by Level 5 to seek injunctive relief and damages from DeLancey, who was previously employed by Level 5 as its Chief Digital Officer, its second most senior executive, and later engaged by the Company as a consultant, for engaging in unfair competition by violating restrictive covenants in a certain written Consulting Agreement dated June 28, 2019 ("Agreement") that Level 5 entered into with DeLancey immediately following his resignation as an employee from the Company. Upon his resignation as an employee, and as partial inducement for the Company entering into the Agreement, DeLancey represented to Level 5 that

he wanted to start his own business as the reason for his departure and vowed that his new venture would not compete with the Company. According to DeLancey, his new business would offer a Business Development Center ("BDC") call center and inventory pricing tool for RV, marine and powersport dealerships, services that Level 5 did not offer, and, indeed, would be complimentary to Level 5's suite of services.

2.      However, Level 5 has learned first-hand that through his activities as founder and chief executive officer of his new business, called Dealership Toolkit, DeLancey has breached and is continuing to breach the Agreement's non-competition obligations. First, he is and has been actively promoting and selling products and services designed to replicate and replace those that Level 5 offers. Instead of selling just BDC call center and inventory pricing services and products, DeLancey, through Dealership Toolkit, is in the business of providing digital advertising, social media advertising, search engine optimization, geo location marketing, lead conversion, email and direct mail – precisely the same set of products and services offered by Level 5. Second, in his new capacity as CEO of Dealership Toolkit, DeLancey has targeted and is targeting the very same industry subsector that Level 5 caters to, namely RV, marine and powersport dealerships, including many of the same clients that he was responsible for as an executive for Level 5. For example, DeLancey was a featured speaker on behalf of Dealership Toolkit at two recent, major industry trade shows, for the RV Dealers Association ("RVDA") November 11-15, 2019 in Las Vegas, NV, and the Marine Retailers Association of the Americas ("MRAA") December 8-11, 2019 in Tampa, FL. During both shows, Mr. DeLancey publicly promoted on behalf of Dealership Toolkit products and services that directly compete with Level 5's offerings.

3.     In addition, Level 5 has learned that through his activities as founder and chief executive officer of Dealership Toolkit, DeLancey has breached and is continuing to breach his non-solicitation obligations under the Agreement by soliciting Level 5's clients with whom he had direct and executive level responsibility during his Level 5 employment. Level 5 has also learned that DeLancey has met directly with multiple Level 5 clients to promote Dealership Toolkit's competing products. In addition, he has publicly solicited Level 5 clients to work with Dealership Toolkit through social media postings on Facebook.

4.     Moreover, DeLancey has also identified himself as the Chief Digital Officer for Dixie RV, one of the Level 5's largest clients. Since DeLancey's departure as an executive employee of Level 5, Dixie RV's spend with Level 5 has fallen from over $114,000 per month to less than $14,000 per month.  Furthermore, DeLancey has induced the principal owners of Dixie RV to invest in and be the primary funders of Dealership Toolkit.

5.     In addition to his unfair competition and customer interference, DeLancey also has breached the restrictions in his Agreement against soliciting Company employees.   Dealership Toolkit, through DeLancey, has already recruited and hired at least one other Level 5 employee (and DeLancey's wife), Elizabeth Martin ("Martin"), and appointed her chief operating officer of Dealership Toolkit.  Martin, until September 30, 2019, also served as a member of Level 5's senior management and is also subject to post-employment non-competition and non-solicitation obligations to Level 5.  The Company has learned that Martin has also been in contact with other Level 5 employees, discussing employment opportunities with Dealership Toolkit.

3

## PARTIES

6.     Level 5 is a trade name for Team Velocity Marketing, LLC, which currently is, and at all relevant times was, a limited liability company duly organized and existing under the laws of the State of Delaware, with its principal place of business located in Virginia.

7.     Upon information and belief, DeLancey is a resident of the State of Florida, who resides at 8020 Clementine Lane, Tampa, Florida 33625.

## JURISDICTION AND VENUE

8.     This Court has original jurisdiction pursuant to Va. Code Ann. § 8.01-328.1(3)-(4). DeLancey purposefully entered into his Agreement with Level 5 that contains a forum selection clause and consents to personal jurisdiction.

9.     Venue is placed in this Court because the parties have agreed, based on a contractually-agreed forum selection clause, to bring disputes relating to DeLancey's Agreement in this Court.

## GENERAL BACKGROUND

10.     Level 5 is a full-service provider of marketing and technology solutions to RV, marine and powersports dealerships throughout the United States.  Level 5's proprietary technology platform, Compass™, is a combined website and automated marketing platform that analyzes Dealership Management System ("DMS"), CRM, marketing, and website data to predict who and when customers will buy and service their RVs, boats and motorcycles. Compass automates the entire customer communication and marketing process by delivering hyper-personalized campaigns across every touchpoint, maximizing ROI and revenue for Level 5's dealership clients. Level 5's services and products include targeted advertising through email,

direct mail, social media advertising, online digital display, pay-per click, and pre-roll video advertising. The Company also develops, hosts and manages websites for its dealer clients.

11. Level 5 has invested and continues to invest significant resources, in excess of seven figures, to develop proprietary, highly confidential, non-public information, methods and techniques (and databases to store such information) to: (a) identify ongoing and potential client contacts in the RV, marine, and powersport industries; (b) identify the key individuals responsible for making advertising and marketing purchasing decisions for their individual companies; (c) maintain, develop, and nurture business relationships (and associated goodwill, including market identity, branding, and connection to its products and services) with those companies and individuals; (d) learn its customers' business needs and provide each customer with customized campaigns (e) develop innovative marketing and technology solutions to meet customers' advertising and marketing needs; (f) develop cutting-edge technology, including, but not limited to, artificial intelligence, for each of its customers to identify in-market prospects with the highest statistical probability of buying and servicing with the customers; (g) develop a proprietary platform that analyzes DMS, CRM, marketing and website data to predict in-market prospects; and (h) set appropriate pricing for its products and services.

12. Level 5 has invested considerable time, expense, and resources in its employees, including DeLancey, to train and permit them to perform their marketing and technology work for Level 5 at the highest level of competency. DeLancey was the second highest executive at Level 5, responsible for and intimately familiar with the entire operation of the business, including its proprietary technology and confidential customer relationships. As such, he had access to the Company's most sensitive confidential information, including its financial information, pricing, margins, technology, marketing strategies, customer lists, prospective

5

customer lists, as well as confidential customer information, including access to their business metrics, advertising strategies, and customer databases.

13.     The information, training, databases, and methodologies developed by Level 5 described above are valuable, confidential and proprietary to Level 5 and are not readily available in the public domain. The aforementioned information and goodwill developed have significant economic value to Level 5, and would be of significant economic value to competitors in the RV, marine, and powersport industries.

14.     To protect its legitimate business interests with respect to the aforementioned information, Level 5 requires that employees, such as DeLancey, to sign non-solicitation and non-competition agreements as a condition of employment.

15.     Prior to his involvement with Level 5, DeLancey had no knowledge of Level 5's confidential information or trade secrets, *i.e.*, the identity of Level 5's customer, its contacts of those customers, its customers' needs or the unique technology Level 5 developed to provide its advertising and marketing services.

## DELANCEY'S EMPLOYMENT WITH LEVEL 5

16.     On or around August 19, 2013, one of Level 5's affiliated companies that was engaged in advertising in the automotive space hired DeLancey, who performed successfully to the point where he was eventually was promoted to oversee and operate a new RV-focused advertising business that became Level 5. Among other positions, he held the position of Chief Digital Officer. DeLancey worked remotely from his home in Florida, but serviced clients throughout the United States.

6

17.     As part of his advancement into leadership positions with the Company, he was awarded certain stock units in Level 5's parent company, Data Driven Holdings, LLC.  DeLancey was also one of the most highly compensated employees at the Company.

18.     DeLancey was employed by Level 5 from approximately August 19, 2013 to June 28, 2019, at which point he decided he wanted to leave the Company to start his own business, a business he represented would not compete with Level 5.

19.     In discussions with Level 5 about his departure, DeLancey stated that he wanted to maintain his stock position with Level 5's parent company as well as continue earning commissions on certain sales he made, and was making, with the Company.  Accordingly, the Company and DeLancey agreed that he would assume a consulting role, and on or around June 28, 2019, Level 5 engaged DeLancey as a consultant for Level 5 in Fairfax, Virginia, at which time he entered into the Agreement.

20.     In his engagement as a consultant with Level 5, DeLancey was responsible for supporting and maintaining Level 5's relationships with certain major customer accounts in the RV, marine, and powersports industries, as well as securing new business with other major dealerships.  He had extensive contacts with Level 5's customers throughout the country.

21.     The Consulting Agreement, a copy of which is attached as Exhibit A, provides, in relevant part, as follows:

> 10. **BUSINESS RELATIONSHIPS.**
> (a) **Non-Solicitation.**  During the term of this Agreement and for a period of twelve (12) months thereafter, Consultant will not: (i) divert or attempt to divert from Company or Company Affiliate any business of any kind or solicit or interfere with any of their clients, prospective clients, business partners or vendors, provided however that Consultant will not be liable for reductions in marketing spends/budgets caused by the purchase of new software or hardware developed by the Consultant; (ii) solicit, induce, recruit or encourage any person employed by the Company or Company

7

Affiliate to terminate their employment with Company or Company Affiliate; or (iii) hire or employ, for itself or for any other entity, any person who was employed by the Company or Company Affiliate during the 12-month period prior to such attempted hiring.

(b) **Non-Competition**. Consultant acknowledges that Company's and Company Affiliate's relationships with their employees, clients, prospective clients, business partners, vendors and other entities are valuable business assets, and that there is a substantial likelihood that if Consultant were to directly compete with Company or Company Affiliate, it would result in the unauthorized use or disclosure of Confidential Information that would be extremely difficult to detect or prove or would otherwise harm the Company's relationship with such parties. Therefore, and in consideration for Company entering into this Agreement, Consultant agrees that during the term of this Agreement and for a period of twelve (12) months after termination, which such period, if the Company has a change of majority ownership or control to a third party, shall be reduced to six (6) months after termination, Consultant will not, directly or indirectly engage or participate in any business that provides or designs (i) marketing or advertising services or products for the automotive, recreational vehicle, power sports, marine industries or (ii) advertising or web design services or products that directly compete with the services or products of the Company or Company Affiliate in the geographic markets served by the Company or Company Affiliate. The foregoing is not intended to restrict Consultant from (x) using Consultant's general and specialized industry and technical knowledge in other businesses or projects or (y) developing a pricing tool, as described by Consultant to Company, for the recreational vehicle, power sport and marine industries, as long as Consult complies with the Confidential Information and Intellectual Property obligations set forth in this Agreement.

22.     The parties agreed that DeLancey could develop a pricing tool, as reflected in the non-compete carve out in his Agreement, and Level 5 recognized that it, along with the BDC call center that DeLancey intended to sell in his new business, could conceivably lower the amounts of monthly advertising and marketing spend that customers might spend with Level 5. The non-solicitation provision expressly contemplated possible reduction in customer spend based on DeLancey's development of hardware or software associated with the pricing tool. The parties

8

discussed and agreed that any reduction, however, would have a minimal impact on the overall customer monthly advertising spend with Level 5. Moreover, Level 5 did not agree to allow him to offer, and the Agreement does not carve out, the multiple other products and services that DeLancey is now selling through Dealership Toolkit.

23.     On November 15, 2019, in response to DeLancey's material and on-going breaches, including violations of the non-compete and non-disparagement provisions, the Company terminated the Agreement.  DeLancey's material breach of his obligations under the Agreement also resulted in the forfeiture of all stock units he held in Level 5's parent company.

24.     By fact of his employment as an employee and engagement as a consultant for Level 5 and the knowledge he derived therefrom, DeLancey took with him Level 5's sensitive, confidential, proprietary and trade secret information.

25.     DeLancey took with him his knowledge regarding Level 5's customers, including the customer's confidential and proprietary financial, marketing and customer information, and as well as Level 5's database of potential customers and in-market prospects.  DeLancey also took him with an extensive understanding of Level 5's proprietary technology intended to serve Level 5's customers.

## DELANCEY'S FOUNDING OF DEALERSHIP TOOLKIT

26.     While the exact date of its commencing business is yet unknown to Level 5, DeLancey is now founder and Chief Executive Officer of Dealership Toolkit based in Tampa, Florida.

27.     Dealership Toolkit is engaged in the advertising and marketing business of providing products and services to RV, marine, automotive and powersport dealerships. Dealership Toolkit's website advertises that the company is building "much needed tools to

support the in-dealership sales efforts" in these sectors. Dealership Toolkit asserts that they have "enhanced technology" that will allow "dealers [to] be able to serve their customer body in a more efficient and greater profit generating manner." (A hard copy of Dealership Toolkit's homepage and products page is attached as Exhibit B; a copy of a marketing brochure distributed to clients by Dealership Toolkit at the RVDA trade show is attached as Exhibit C.)

28. Since founding Dealership Toolkit, DeLancey is engaging in the same business of selling marketing and technology products and services to Level 5's clients in the RV, marine, automotive and powersport industries that he was engaged in as an employee and consultant for Level 5, offering products and services beyond those to which the parties agreed in the Agreement.

29. DeLancey has held multiple public presentations at various industry tradeshows, including at RVDA and MRAA during which he has promoted Dealership Toolkit and products and services that are in direct competition with the products and services offered by Level 5.

30. At the RVDA tradeshow, DeLancey expressly asked the President of Level 5 to not attend a presentation open to all show participants that DeLancey was giving, demonstrating a desire to conceal the fact that he was promoting products and services, through Dealership Toolkit, that were in direct competition with the products and services offered by Level 5.

31. Since DeLancey's voluntary termination of his employment for Level 5, the revenue generated from one of Level 5's major clients, Dixie RV, has decreased approximately $100,000 per month. Since founding and becoming CEO of Dealership Toolkit, DeLancey, upon information and belief, has approached, contacted, solicited, and/or induced Dixie RV to engage in business with Dealership Toolkit, which has diverted revenue from Level 5 to Dealership Toolkit.

10

32.    Since founding and becoming CEO of Dealership Toolkit, DeLancey, upon information and belief, has solicited Dixie RV and/or its principals to invest in Dealership Toolkit. In addition, DeLancey identifies himself as Chief Digital Officer for Dixie RV.

33.    Since founding and becoming CEO of Dealership Toolkit, DeLancey, upon information and belief, has approached, contacted, solicited, and/or induced other Level 5 clients, including, but not limited to, Colton RV and Fun Town RV, to engage in business with Dealership Toolkit. Colton RV, which spent over $50,000 per month with Level 5 prior to DeLancey's resignation as an employee has since cancelled its contract altogether. During the same period, three of Fun Town's dealerships, which together were spending $90,000 per month, cancelled with Level 5.

34.    Since founding and becoming CEO of Dealership Toolkit, DeLancey, upon information and belief, has approached, contacted, solicited, and/or induced Level 5 employees for the purpose of causing them to terminate their employment with Level 5 and work for Dealership Toolkit.

35.    Upon information and belief, DeLancey has used his knowledge of Level 5's clients, potential client database, and Level 5's proprietary technology to assist Dealership Toolkit in the further of its business.

36.    Upon information and belief, DeLancey has realized earnings and/or profits for himself and Dealership Toolkit from using, soliciting, and disclosing confidential and proprietary information and trade secrets in violation of his Agreement.

37.    Upon information and belief, DeLancey has caused Elizabeth Martin, a former Level 5 employee, to terminate her employment with Level 5 and begin employment at Dealership Toolkit.

11

38.     As a direct and proximate result of DeLancey's actions, including, but not limited to, his violation of the Agreement, Level 5 has been, and continues to be, damaged in an amount that is difficult, if not impossible, to determine unless DeLancey is enjoined from the aforementioned conduct.

39.     In an effort to resolve this situation before resorting to litigation, Level 5 placed DeLancey on written notice of his post-employment obligations, and its intent to bring a lawsuit to enforce its rights. Such notice was issued prior to the second trade show, MRAA. Nevertheless, during the MRAA show, DeLancey continued to violate and is continuing to violate his non-solicitation and non-competition obligations under the Agreement.  Accordingly, Level 5 must proceed with the instant action.

**COUNT I**
**BREACH OF CONTRACT**

49.     Level 5 incorporates herein by reference the allegations of the preceding paragraphs.

50.     DeLancey's Agreement is a valid and enforceable contract between DeLancey and Level 5, and Level 5 has performed all necessary conditions precedent to its enforcement.

51.     By founding Dealership Toolkit and being employed as the CEO of Dealership Toolkit and engaging in the same business at Dealership Toolkit that DeLancey engaged in as a consultant for Level 5, DeLancey has breached, and continues to breach, the non-competition obligation under the Agreement. DeLancey has breached the customer non-solicitation restrictions in the Agreement based on his interference and communications with multiple Level 5 clients. He similarly has breached the employee non-solicitation restriction based on his communications with Company employees for purposes of inducing them to terminate their employment.

12

52.    By such action, DeLancey has caused damages in an amount to be determined at trial, and also continues to cause Level 5 immediate and irreparable harm for which Level 5 has no adequate remedy at law.

53.    DeLancey's ongoing wrongful competition has harmed Level 5's goodwill, diminishing its reputation and brand, compromising the investment in the goods and services it offers to key customers, and devaluing the trust and loyalty Level 5 otherwise enjoyed in the business relationships it worked to develop and nurture.

54.    DeLancey will continue such wrongful conduct unless enjoined.

55.    As a consequence, Level 5 is entitled to a temporary restraining order, preliminary and permanent injunctive relief.

WHEREFORE, Level 5 respectfully requests this Court:

A. Order injunctive relief enjoining DeLancey, for one (1) year from its entry, from competing with Level 5, as described in the Agreement, in the geographic territory described therein;

B. Order injunctive relief enjoining DeLancey, for one (1) year from its entry, from soliciting or attempting to solicit Level 5's customers or employees, or assisting any other person in any way soliciting Level 5's clients or employees in accordance with the Agreement;

C. Order injunctive relief enjoining DeLancey from disclosing any of Level 5's confidential or proprietary information, or using such information to benefit himself, Dealership Toolkit or another third party in accordance with the Agreement;

D. Award Level 5 its attorneys' fees, costs and expenses, as well as pre- and post-

13

judgment interest; and

E.  Grant such other and further relief as the Court may deem just, equitable and proper.

Dated:  January 21, 2020

Paul J. Kennedy (VSB #29802)
pkennedy@littler.com
Joon Hwang (VSB #82248)
jhwang@littler.com
LITTLER MENDELSON, P.C.
1650 Tysons Boulevard, Suite 700
Tysons Corner, Virginia  22102
Tel.: 703.442.8425
Fax: 703.442.8428

*Counsel for Plaintiff Team Velocity Marketing, LLC*

## VERIFICATION

I, Henry Blackburn, owner and co-founder of Plaintiff Team Velocity Marketing, LLC,

verify under penalty of perjury, pursuant to Section 8.01-4.3 of the Virginia Code, that the factual

allegations in the foregoing Verified Complaint are true and correct to the best of my knowledge,

information and belief.

Dated: January 21, 2020



Henry Blackburn

**Signature:** _____

Budd Blackburn (Jan 20, 2020)

**Email:** budd@buddblackburn.com

**Title:** Owner

**Company:** Level 5 Advertising

# Exhibit A

 ADVERTISING™

### LEVEL 5®

### CONSULTING AGREEMENT

This **Consulting Agreement**, including the (a) **Terms and Conditions** (or "*Terms*") attached as Schedule A and (b) the **Scope of Work** ("*SOW*") attached as Schedule B (collectively, "*Agreement*") between **Team Velocity Marketing, LLC** d/b/a **LEVEL 5** ("*Company*") and **Rich DeLancey** ("*Consultant*") is entered into as of June 28 2019 ("*Effective Date*").

**Whereas**, Consultant has been employed with Company since August 19, 2013, currently as Chief Digital Officer of Level 5;

**Whereas**, Consultant entered into a Non-Competition and Confidentiality Agreement dated August 19, 2013 with Company and a Non-Competition and Confidentiality Agreement dated January 22, 2014 with Tier 10 Marketing, LLC, an affiliate of Company (collectively, "*Employment Agreement*") governing Consultants relationship with Company, which includes, among other restrictions, a 24-month post-employment non-compete;

**Whereas**, Consultant's employment with Company shall terminate on the Effective Date;

**Whereas**, Company desires to engage Consultant as a consultant to provide certain professional services in accordance with this Agreement.

**Whereas**, in connection with Consultant entering into this Agreement, Company agrees that the 12-month non-compete and non-solicitation restrictions set forth in this Agreement shall supersede and replace that which is set forth in the Employment Agreement.

**Whereas**, Consultant and Data Driven Holdings, LLC ("*DDH*"), Company's parent, entered into a Profits Interest Plan Award Agreement dated December 28, 2018 ("*Award Agreement*");

**Whereas**, as a condition of Company entering into this Agreement, Consultant agrees to execute an amendment to the Award Agreement, dated as of the Effective Date, in the form provided to Consultant;

The parties have executed this Agreement as of the Effective Date.

**CONSULTANT: Rich DeLancey**

By (signature): *Richard DeLancey* (Richard DeLancey (Jun 28, 2019))

Date: June 28, 2019

**COMPANY:  Team Velocity Marketing, LLC**
              d/b/a **Level 5**

By (signature): *William J. Reilly* (William J. Reilly (Jun 28, 20..))

Name (print):  William Reilly

Title:         Chief Operating Officer

Date:          June 28, 2019



## LEVEL 5

## CONSULTING AGREEMENT

### Schedule A - Terms and Conditions

1.    **SERVICES**.    During    the    Term, Consultant shall provide such professional, consulting, advisory and/or other products and services    agreed    upon    by    the    parties ("**Services**"), as described in the initial Scope of Work (or "**SOW**") attached as Schedule A hereto, together with any schedules thereto, as may    be    modified    in    accordance    with    this Agreement, as well as any additional SOWs agreed    to    by    the    parties    and    incorporated herein.

2.    **FEES    AND    PAYMENTS**.    As compensation for the Services, Company shall pay Consultant, subject to the terms of this Agreement and any conditions set forth in the applicable SOW, the amount set forth in the applicable    SOW    ("**Fees**").    Company    will reimburse Consultant for reasonable and actual out-of-pocket expenses, only if pre-approved by Company in writing. Except for such pre-approved expenses, Consultant shall bear all expenses    incurred    in    performance    of    its obligations under this Agreement. Fees shall be paid to Consultant by Company as set forth in the SOW. Authorized expense reimbursements shall be paid within thirty (30) days after receipt of    documentary    support    for    any    expenses incurred.    Consultant    shall    be    responsible    for payment of any income and employment taxes relating to the Fees.

3.    **TERM    AND    TERMINATION**.    This Agreement shall commence on the Effective Date and continue until the earlier of (a) the end of the term, if any, set forth in the most current SOW ("**Term**") or (b) termination by either party in    accordance    with    this    Agreement.    Unless otherwise set forth in the SOW, this Agreement

may be renewed by mutual written agreement of the parties. Either party may terminate the Agreement: (x) for a breach by the other party not cured within 30 days of notice by the non-breaching party; (y) immediately upon notice in the case of material breach that is not curable; or (z) immediately upon notice if the other party: (i)    voluntarily    commences    or    has    instituted against it, and not dismissed within 60 days, bankruptcy or similar proceedings; (ii) makes an assignment    of    all    or    substantially    all    of    its assets, or if the Company has a change of majority ownership or control to a third party; (iii) generally fails to pay its debts when due; or (iv) dissolves or ceases to do business. Company may terminate this Agreement upon notice to Consultant at any time, with or without cause, and without further obligation to Consultant, other than payment of Fees and expenses already due. Consultant may terminate this Agreement at any time upon 30 days prior written notice.

4.    **INTELLECTUAL PROPERTY.**

    (a)    **Retention of Rights**. Each party shall retain all rights, title, and interest, in and to its patents, trademarks, logos, copyrights, trade secrets, and any other intellectual property, whether arising by operation of law, contract, license,    or    otherwise,    together    with    all registrations,    applications,    renewals, extensions,    continuations,    divisions    or reissuances thereof ("**Intellectual Property**").

    (b)    **Service    Marks    and    Logos.** Consultant shall not use, directly or indirectly, in whole    or    in    part,    in    connection    with    this Agreement or as part of its corporate, business



or personal name, any signature, monogram, logo, trademark, service mark, or trade name (a "**Mark**") that is now or may hereafter be owned, licensed or used by Company (a "**Company Mark**"), except in the manner and to the extent approved in advance in writing by Company, which approval Company may withdraw at any time for any reason. Consultant shall discontinue any approved use of a Company Mark immediately upon termination or expiration of this Agreement, and thereafter shall not use any Mark which, in the reasonable judgment of Company, so nearly resembles any Company Mark that confusion or uncertainty by a third party may reasonably result there from. Consultant hereby expressly disclaims any and all right, title and interest in and to any Company Mark, whether or not used by Consultant.

(c) **Inventions**. Consultant acknowledges that all work product produced under this Agreement shall be a work made for hire within the meaning of Title 17 of the United States Code owned solely by Company. To the extent that any such work product is deemed not to be a work made for hire, Consultant assigns all right, title, and interest in and to such work to Company, including but not limited to any Intellectual Property interests, as well as all documents, electronic files, and other tangible embodiments of any of the work product prepared by Consultant pursuant to this Agreement ("**Work Product**"). Consultant agrees to maintain such records of its work relating to Work Product as shall be reasonably required by Company and to deliver to Company all embodiments of the Work Product produced under this Agreement. Consultant waives all claims to moral rights in any Work Product. During and after the term of this Agreement, Consultant agrees to execute any and all assignments and other instruments, documents, and papers, and to cooperate fully with Company to the extent necessary or

desirable to enable Company to assign, transfer, secure, maintain, defend and enforce its rights in any of the Work Product. All rights granted to Company by this Agreement shall be applicable in all media including, without limitation, all electronic media.

(d) **General Knowledge**. Notwithstanding the foregoing, Company acknowledges that Consultant and its employees, if any, are engaged in other businesses and projects and that they have both general and specialized industry and technical knowledge that will not be assigned or assignable to Company in connection with this Agreement.

(e) **Third Party Intellectual Property**. Further, to the extent that any work produced by Consultant under this Agreement incorporates materials or information owned by Consultant and not specifically created for Company under this Agreement, Consultant maintains ownership of such work and grants Company a non-exclusive, worldwide, perpetual, assignable, sub-licensable and royalty-free license to such materials and information, for use only as incorporated.

5.    **CONFIDENTIAL INFORMATION**.

(a) **Definition**. "**Confidential Information**" means all non-public written or oral information disclosed by one party ("**Discloser**") to the other party ("**Recipient**") identified as confidential at the time of disclosure, any information that derives from or reveals any Confidential Information, and any information that, based on its nature and the circumstances surroundings its disclosure, a reasonable person would consider confidential or proprietary.

(b) **Use and Care**. With respect to each other's Confidential Information, each party shall: (i) maintain its confidentiality in



accordance with industry standards; (ii) use it solely in connection with this Agreement; (iii) limit access to those who require it to perform their obligations hereunder; and (iv) require that anyone with access is subject to confidentiality requirements no less restrictive than those contained herein.

(c) **Exceptions**. Confidential Information does not include information that: (i) was already in Recipient's possession when first disclosed by Discloser; (ii) was in the public domain when disclosed to Recipient or enters the public domain through no fault of Recipient; (iii) is made available by Discloser to a third party on an unrestricted, non-confidential basis; (iv) was lawfully obtained by Recipient from a third party not under confidentiality obligations to Discloser; (v) was independently developed by Recipient by persons without access to or use of Discloser's Confidential Information or Intellectual Property; or (vi) is required by law to be disclosed, provided, to the extent legally permissible, Recipient notifies Discloser prior to such disclosure to enable Discloser to seek confidential treatment.

6. **DATA SAFEGUARDS**. Consultant has implemented and will maintain administrative, technical, and physical safeguards in accordance with industry standards and will protect and secure all Confidential Information it obtains under this Agreement as required under all applicable privacy and data security laws. Confidential Information may include "Personally Identifiable Information" (or "**PPI**") as defined in the Gramm-Leach-Bliley Act belonging to Company, its clients or their customers. Any PPI transmitted or stored by Consultant in connection with the Services will be transmitted or stored securely in accordance with industry standards. Consultant shall not access, enhance, store, share, disclose, sell, distribute, create derivative works from, or use or any other PPI for any reason, except as

necessary to provide the Services. Consultant has no license or other rights to PPI, except as necessary to perform the Services, and will not use PPI in any form to append, trigger, update, enhance, or enrich its or any third party's data or data service. Upon the earlier of termination of this Agreement or request by Company, Consultant will no longer access any of PPI and shall return or destroy any in its possession.

7. **REPRESENTATIONS AND WARRANTIES**. Consultant represents and warrants that: (i) it shall perform all Services in a professional, ethical, and timely manner consistent with industry standards; (ii) its performance of its obligations under this Agreement will not knowingly violate any other agreement between it any third party; (iii) it shall not subcontract or otherwise delegate its obligations under this Agreement without Company's prior written consent, which may be refused in Company's sole discretion; (iv) it shall strictly comply with all applicable laws, regulations and public policies, and refrain from taking any action which would cause Company to be in violation of any such laws or regulations; and (v) it shall avoid deceptive, misleading or unethical practices that could damage the reputation of Company. Any breach of any of these representations and warranties shall constitute a material breach of this Agreement and may result in immediate termination of this Agreement by Company.

8. **LIMITATION OF LIABILITY**. Except for confidentiality breaches and indemnification for third party claims, no party shall be liable for any indirect, incidental, special, consequential, punitive and/or exemplary damages of any kind arising out of or relating to this Agreement, including, but not limited to, lost profits or revenue, business interruption, or loss of business information, even if such party has been advised of the possibility of such damages.



9.    **INDEMNIFICATION.** Each party (an "Indemnifier") agrees to indemnify and defend the other party and its subsidiaries, affiliates and assigns, and its and theirs officers, directors, members, employees and agents (the "Indemnifieds") from and against any and all losses, liabilities, damages, or costs (including reasonable attorneys' fees) ("Losses") incurred by the Indemnifieds resulting from a third party action, suit or proceeding ("Claim") resulting from the Indemnifier's: (a) gross negligence or willful misconduct; or (b) a material breach of any of its representations, warranties, and obligations. Consultant shall further indemnify and defend Company and its Indemnifieds from and against any Losses resulting from a Claim that any Service infringes any third party intellectual property right.

10.    **BUSINESS RELATIONSHIPS.**

(a)    **Non-Solicitation.** During the term of this Agreement and for a period of twelve (12) months thereafter, Consultant will not: (i) divert or attempt to divert from Company or Company Affiliate any business of any kind or solicit or interfere with any of their clients, prospective clients, business partners or vendors, provided however that Consultant will not be liable for reductions in marketing spends/budgets caused by the purchase of new software or hardware developed by the Consultant; (ii) solicit, induce, recruit or encourage any person employed by Company or Company Affiliate to terminate their employment with Company or Company Affiliate; or (iii) hire or employ, for itself or for any other entity, any person who was employed by the Company or Company Affiliate during the 12-month period prior to such attempted hiring.

(b)    **Non-Competition.** Consultant acknowledges that Company's and Company Affiliate's relationships with their employees, clients, prospective clients, business partners, vendors and other entities are valuable business assets, and that there is a substantial likelihood that if Consultant were to directly compete with Company or Company Affiliate, it would result in the unauthorized use or disclosure of Confidential Information that would be extremely difficult to detect or prove or would otherwise harm the Company's relationship with such parties. Therefore, and in consideration for Company entering into this Agreement, Consultant agrees that during the term of this Agreement and for a period of twelve (12) months after termination, which such period, if the Company has a change of majority ownership or control to a third party, shall be reduced to six (6) months after termination, Consultant will not, directly or indirectly engage or participate in any business that provides or designs (i) marketing or advertising services or products for the automotive, recreational vehicle, power sports, marine industries or (ii) advertising or web design services or products that directly compete with the services or products of the Company or Company Affiliate in the geographic markets served by the Company or Company Affiliate. The foregoing is not intended to restrict Consultant from (x) using Consultant's general and specialized industry and technical knowledge in other businesses and projects or (y) developing a pricing tool, as described by Consultant to Company, for the recreational vehicle, power sport and marine industries, as long as Consultant complies with the Confidential Information and Intellectual Property obligations set forth in this Agreement.

(c)    **Non-Disparagement.** Consultant agrees to refrain from making any statements to third parties that disparage or otherwise impugn the reputation or character of Company, Company Affiliate, or any of their employees, officers, directors, agents, stockholders, attorneys, successors, and assigns. Company agrees to refrain from directly or indirectly making any statements to third parties that disparage or otherwise impugn the reputation or



charter of Consultant. This Section shall survive termination of this Agreement.

11.    **GENERAL.**

(a)    **Independent Contractor**. In providing Services, Consultant shall, at all times, be deemed an independent contractor and not an employee of Company.  The selection of the details and means by which Consultant fulfills its obligations under this Agreement is the responsibility of Consultant and not of Company, which shall exercise no control in this regard. Consultant shall have no authority to act on behalf of or bind Company, except as expressly authorized by Company in writing. Consultant will indemnify, defend and hold harmless Company, its officers, directors, and employees, from and against any losses, liabilities, costs (including reasonable attorneys' fees) or damages resulting from any claim by a third party relating to any allegation that Consultant has acted as an agent, partner, or employee of Company. Consultant understands that this appointment as an independent contractor is on a non-exclusive basis and Company reserves the right to appoint other Consultants to provide the same or similar services.

(b)    **Assignment**. Consultant may not assign its rights or delegate its obligations under this Agreement without Company's prior written consent, which may be withheld in Company's sole discretion. Company may assign this Agreement to an affiliate or as a result of a change in control or sale of all or substantially all assets, upon written notice.

(c)    **Governing Law**. This Agreement shall be governed by the laws of the Commonwealth of Virginia, without regard to the choice of law principles thereof. Each party hereby consents to the exclusive jurisdiction of the state and federal courts located in Fairfax County, Virginia, provided that either party may seek injunctive relief in any court of competent jurisdiction. The prevailing party shall be entitled to reasonable attorney fees. The parties waive any rights to trial-by-jury.

(d)    **No Publicity**.  Unless required by applicable laws, neither party will, without the prior written approval of the other party, make any public statement, press release, presentation, or other announcement relating to the existence or terms of this Agreement.

12.    **Miscellaneous.** This Agreement: (a) covers the parties' entire agreement, and supersedes all prior discussions and writings between them, relating to its subject matter; (b) will be binding upon and inure to the benefit of the parties, their successors and permitted assigns; and (c) has no third party beneficiaries (other than the Indemnifieds with respect only to the provisions under the Section on Indemnification). If any provision in this Agreement is deemed invalid, illegal, or otherwise unenforceable, such provision shall be enforced, as nearly as possible, in accordance with the parties' intent; the remainder shall remain in full force and effect. No failure or delay by a party in enforcing this Agreement shall be construed as a waiver of any of its rights under it. No party shall be deemed in default of this Agreement if the performance of its obligations is delayed or prevented by events beyond its reasonable control. Except as otherwise set forth herein, this Agreement may only be modified by mutual written agreement of the parties. Notices may be delivered electronically (or by mail or in person) and shall be deemed served when delivered to the address specified on the Cover Page; each party shall promptly inform the other of any changes to their contact information. This Agreement may be signed digitally and/or in counterparts, which together will constitute the whole Agreement.

 ADVERTISING™

LEVEL 5®

**LEVEL 5**

**CONSULTING AGREEMENT**

**Schedule B - SCOPE OF WORK**

June 28, 2019

1. <u>Service(s) Description(s)</u>: provide business development activities and major account support to continue Level 5's growth. Specific responsibilities include:

    a. Account Support
        i. Fun Town
            (i) daily reporting to Level 5 designated personnel
            (ii) responding to Level 5 emails
            (iii) travel to Fun Town (as needed)
            (iv) other Fun Town related support as reasonably requested
        (b) Terry Town
            (i) responding to Level 5 emails
            (ii) travel to Terry Town (as needed)
            (iii) other Terry Town related support as reasonably requested
    b. Complete negotiations and close Level 5 transactions with:
        i. Tracker
        ii. Forest River
        iii. National Harley
    c. Other Responsibilities as may be mutually agreed upon from time-to-time

2. <u>Compensation</u>

- 1% of monthly gross revenue, net of pass through revenue, from Fun Town, to continue as long as Consultant is providing Account Support for Fun Town account
- Parties to determine equitable commissions with respect to Terry Town
- New Sales made by Consultant – paid pursuant to then current commission plan, currently = 1.55% commission on new revenue for first 9 months of contract term plus 35% of 1st month Compass Fee

3. <u>Additional Terms</u>

- Expenses and travel, to be pre-approved, and reported/booked through Egencia and Concur
- At Company discretion, Consultant may continue to use @level5advertising email account, when providing consulting services

**Signature:** *Richard DeLancey*
Richard DeLancey ( Jun 28, 2019)

   **Email:** rdelancey@level5advertising.com

   **Title:** Consultant

**Company:** Richard DeLancey

**Signature:** *William J. Reilly*
William J. Reilly ( Jun 28, 2019)

   **Email:** breilly@teamvelocitymarketing.com

   **Title:** Chief Operating Officer

**Company:** Team Velocity Marketing LLC, dba L5 Advertising

# L5_Delancey_Consulting_Agreement(final)

**Final Audit Report**                                                                                2019-06-28

| | |
|---|---|
| Created: | 2019-06-28 |
| By: | Lane Blumenfeld (lblumenfeld@teamvelocitymarketing.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAj_ApA2YvkWG-EgahON_QOaOSMQI2H1cS |

## "L5_Delancey_Consulting_Agreement(final)" History

📄 Document created by Lane Blumenfeld (lblumenfeld@teamvelocitymarketing.com)
   2019-06-28 - 8:41:39 PM GMT- IP address: 100.15.186.106

📧 Document emailed to Richard DeLancey (rdelancey@level5advertising.com) for signature
   2019-06-28 - 8:43:16 PM GMT

📄 Email viewed by Richard DeLancey (rdelancey@level5advertising.com)
   2019-06-28 - 9:58:30 PM GMT- IP address: 35.137.128.78

✍ Document e-signed by Richard DeLancey (rdelancey@level5advertising.com)
   Signature Date: 2019-06-28 - 9:59:42 PM GMT - Time Source: server- IP address: 35.137.128.78

📧 Document emailed to William J. Reilly (breilly@teamvelocitymarketing.com) for signature
   2019-06-28 - 9:59:44 PM GMT

📄 Email viewed by William J. Reilly (breilly@teamvelocitymarketing.com)
   2019-06-28 - 10:01:29 PM GMT- IP address: 38.118.71.150

✍ Document e-signed by William J. Reilly (breilly@teamvelocitymarketing.com)
   Signature Date: 2019-06-28 - 10:02:43 PM GMT - Time Source: server- IP address: 38.118.71.150

✓ Signed document emailed to Lane Blumenfeld (lblumenfeld@teamvelocitymarketing.com), Lewis Conner (lconner@teamvelocitymarketing.com), William J. Reilly (breilly@teamvelocitymarketing.com), and Richard DeLancey (rdelancey@level5advertising.com)
   2019-06-28 - 10:02:43 PM GMT

Adobe Sign

# Exhibit B





Dealership Toolkit

Home    Products    Webinars & Trade Shows    Who We Are    Blog    Careers    Schedule A Demo

## Who We Are

We are a team of experts in the RV, Marine, Automotive and Powersports field. Our team is led by manager Jim Delaney...

Today, Jim and the Dealership Toolkit team seeks to change the game within the industry by...

## Our Job

Our job starts with understanding what Dealer Principals, Managers, and Sales/Service team members need to do their job better. With an incredibly talented and successful dealer advisory network comprised of the top players in RV, Marine, Automotive and Powersports field, Dealership Toolkit stands ready to push into new







## SCHEDULE A DEMO

Thanks again for visiting the website! If any of the following products interest you and your team, please feel free to follow the link and schedule a demo. We implore you to do so! We promise, when we get to show you what we can do, you will see just how excited we are to share these amazing products with the world!

Schedule

Dealership Toolkit

## YOD — YOUR ONLINE DEALERSHIP

Your Online Dealership is your dealer Business Development Center and Call Center. A tracked and dedicated team works easily by phone, email, text and video to bring customers back into the dealership.

YOD agents work to sell cars and help fill your service customers on your appointed events each.

Your Online Dealership works once you've integrated into your process.

Business Development agents communicate with your customers and establish a new process to warm trades.

- YOD review recommend and revise individual dealership cadence of communication to best engage your best prospect.



## BDV — BUSINESS DEVELOPMENT VIDEO

- Personalized customized video to connect to your best buyers or the used and now leased side of your showroom.
- Custom research and create a live process individual marketing.
- Custom scheduling follow up process for your dealership enabling a personalized target based content.



## TSL — TARGETED SOCIAL LEADS

We are specialized leads into your business. We create highly targeted campaigns to deliver leads we can use to dominate your social network of your dealership through and get more of what we can do for you and your team.



Dealership Toolkit





Home    Products    Webinars & Trade Shows    Who We Are    Blog    Careers

Schedule A Demo

## FMT — FACEBOOK MARKETPLACE TOOL

Facebook is hyper-focused on making its "Marketplace" a destination for consumers to buy RVs...and it's working. Times change faster than we can possibly keep up with and Facebook is at the forefront of those change. Their algorithms are constantly adapting to new information and projections for the future. Let us be your bridge to these changes.



## ASI — ABANDONED SHOPPING TECHNOLOGY

you spend thousands of dollars every month driving traffic to your website. Yet the average dealer converts less than 5% of those shoppers. Abandoned Shoppers™ gives you instant access to the ones 95% those that Abandoned your website without filling out a form, emailing or calling.



## GMM — GEO MOBILE MARKETING

We capture Customer's personal data once they enter your competitor's showroom. Name, address, Email Credit Range & Vehicle Make / Model owned. knowledge is power they say, so why not have the needed at your home?






Dealership Toolkit

## KPD — KENSHOO POWERED DIGITAL

Guide your search performance goals with Kenshoo deep data using the development of advanced machine learning models. Lacking your goals with flexibility, transparency, and confidence. From bid to budget, from execution to planning, our award-winning algorithms drive maximum results, even across your customized buying matrices.



## LCT — LEAD CONVERSION TECHNOLOGY

ENABLE THEM TO CONVERT

Every shopper on your website creates data. LCT technology uses artificial intelligence to learn who the "real" shoppers are and we provide only those higher-intent customers with special attention. The longer it's on your site, the smarter it gets.

LCT CONVERTS YOU HAVE AT A

FASTER AND HIGHER RATE



## RVP — PRICING TOOL

It's an old saying that tension, from "Your RV Isn't for sale. I can't price it right." Today's customers know where the shopper be priced, and dealers too often don't pay attention. RVP solves the problem. It gives you guidance to ensure every RV is priced right, for you and your customers.





Dealership Toolkit:




## STV STREAMING TV

For some time, TV Dealers had used Television advertising. Many of those same Dealers could not take the budgets to advertise on TV stations ranging from TBS to CBS in Prime Time. Now, it is possible for those with any virtual TV budgets to advertise through Connected TV & Over The Top devices





## TMP TARGETED MAIL PROGRAM

**Data Management**

Target list generation and our clean data against better demographic campaigns

**Omni-channel Marketing**

We advance the audience with a consistent message through multiple channels

**Engagement Analytics**

Engagement increases conversion. Analytics provides a scoreboard.

We use a scoreboard via BDC Company Only. That means Too bit BDC Base your success AND FOLLOW SHOP



## CED CONQUEST EMAIL DEPLOYMENT

Target Data – Our ability to track consumers' intent to purchase a consumer. We track real-time offers to internet buyers who have visited specific websites within the past 24 hours in search of a RV. Our target data is a tool to generate sponsored spots commonly seen only, the most recent, active intenders interested in purchasing a RV.

Conquest Email Deployment is available only as a BDC Contact. That means the BDC to give us the email deployment via a series of workflows and phone calls.



Dealership Toolkit




**CONQUEST RETAIL DEPLOYMENT**

Trigger Data – Our ability to match consumers' intent to purchase is unmatched. We receive a ready file of triggers for in-market buyers who have visited specific websites within the past 24-hours in search of a RV. Our trigger data allows us to generate sophisticated lists comprised of only the most recent / active in-market buyers interested in purchasing a RV.

Conquest Email Deployment is available on/y as a BDC Combo. That means the BDC follows up the email deployment with a series of work-flows and phone calls.

**LSO**
**LOCAL SEARCH OPTIMIZATION**

Be Found, Trusted & Chosen. Increase SEO, brand awareness & customer acquisition with our platform.

The RV retail customer journey has changed. People expect relevant, engaging, rich content on their smartphones and internet browser.

LSO helps retailers: Across all the local search, social media, and mobile apps... customers on the digital media and devices outlets RV dealerships.






THANK YOU FOR VISITING!

7802 Woodland Center Blvd
Tampa, FL 33614
813-644-3331
info@dealershiptoolkit.com

Contact Us Here

LIKE US ON FACEBOOK!

Dealership Toolkit

Like Page

Be the first of your friends to like this

BLOG POSTS

[Blog posts]

TAKE A LOOK AROUND THE SITE!

Search

Exhibit C







YOUR ONLINE DEALERSHIP

**Your Online Dealership** is a full service Business Development Center (aka Call Center). A trained and dedicated team works leads by phone, email, text and video to drive appointments to your showroom.
BDC agents work your unsold traffic, web leads,TSL leads, service customer follow up and special events leads.

**Your Online Dealership** works right inside of your existing phone system and crm.  Business Development Agents communicate with your customers and your sales team to coordinate appointment times and warm transfers. YOD will review, recommend and revise your workflows and their cadence or build them out from scratch using agreed upon best practices.



YOUR ONLINE DEALERSHIP



BUSINESS DEVELOPMENT VIDEO

$1295



ABANDONED SHOPPING TECHNOLOGY    PRICING TOOL    LEAD CONVERSION TECHNOLOGY

$2695    $895    $995



GEO MOBILE MARKETING

$3995



KENSHOO POWERED DIGITAL

$595



TARGETED SOCIAL LEADS



CONQUEST EMAIL DEPLOYMENT



FACEBOOK MARKETPLACE TOOL

$395



TARGETED MAIL PROGRAM



LOCAL SEARCH OPTIMIZATION

$225



STREAMING TV



ABANDONED SHOPPING TECHNOLOGY

andoned Shoppers™ proprietary software captures the unique
entifiers of your website Shoppers desktops, tablets or cell phones.
e scrub the ID's against over 600 million permissible, opt-in data
cords capturing and matching up to 60% of your Shoppers personal
ita, depending upon your geographic area and website provider.

andoned Shoppers™ captures your website Shoppers name,
ldress, email, compliant telephone and distance from your dealership
thin seconds of landing on your website.
andoned Shoppers™ data is captured in "real time", extrapolated
ogrammatically and stored in a custom dealer dashboard.

andoned Shoppers™ instantly sends an instant branded email
iessage to website Shoppers within seconds on landing on your
ebsite.











**CAPTURE**    **COMMUNICATE**    **TRACK**    **MANAGE**

You spend thousands of dollars every month driving traffic to your website. Yet,
the average dealer converts less than 5% of those Shoppers. Abandoned
Shoppers™ gives you instant access to the other 95%; those that Abandoned
your website without filling out a form, emailing or calling.

**BDV**
BUSINESS DEVELOPMENT VIDEO

**BDV** will create VIN specific Multi-media content of New and Used Inventory. Do it yourself or have our BDC do it for you.

**BDV** will engage online RV shoppers with custom product presentations.



**BDV** (found in the app store or google play) includes video capabilities for Inventory Merchandising, 360°



Interactive Walk Arounds, Sales Follow-up, and Service Repair.

Video has now become the media of choice for prospective RV buyers. 80% of all RV shoppers use online videos in their research, and half of all RV shoppers watch at least thirty minutes of video during the buying process.

Choose **BDV** and allow technology to make video easy.



## RVP PRICING TOOL

**TAKE CONTROL:**
The RV business is a jungle. But now you can take control with RVP a powerful pricing solution that gives you the insight you need.

**PRICING MATTERS:**
It's an old saying that remains true: "Your RV isn't for sale if it isn't priced right." Today's customers know where RVs should be priced, and dealers too often don't pay attention. RVP solves the problem. It gives you guidance to ensure every RV is priced right, for you and your customers.

**LIVE MARKET VIEW:**
See what's happening in your market or across the country — every RV, every second, everywhere.

**ALERTS:**
Set alerts on makes and models and be notified of listed price changes in the marketplace.



## LCT LEAD CONVERSION TECHNOLOGY

**LCT Includes:**
LCT site setup and offer creation
CRM & Website Integration
Offer Trigger & Threshold setup
Offer creative asset library
Dynamic visitor scoring
Unlimited offer creation/modification

**Base Offers on the Following Criteria:**
Geography
Stock Numbers
Classes of RV's
Models of RV's
Number of visits
more.....



**GEO MOBILE MARKETING**



**We Hyper-Target Customers** while they are in your competitor's showroom.

**We can narrow our fence down to 8ft** to shoppers doing their research while they are in your competitors' showroom.

**We measure** response rates by fenced proximity.

Actions ■
Clicks ■
Impressions ■

**We capture** customer's personal data once they enter your competitors' showroom.
Name, Address, Email and Compliant Phone

Number ■
Credit range ■
Vehicle Make/Model owned ■

**KPD**

**KENSHOO POWERED DIGITAL**







## TARGETED SOCIAL LEADS

■ Create High Impact Ads - **We are experts at getting people to click the Facebook® ads we create.** With our huge library of ads and our vast experience we can help you isolate which ads will work best for your dealership.

■ Click to Call Message - **This is the fastest way to generate a lead from an ad click.** Most other forms of advertising require the customer to complete a form. With Social Opps, their information is retrieved right from their Facebook® profile.

■ Handle a High volume of Text Message Leads - **We use advanced technology to provide a lightning fast interface for text messaging customers who have responded to your ads.**

## CONQUEST EMAIL DEPLOYMENT



**FACT:**
More than half (53%) of RV shoppers use a mobile device in their quest for RV information.

**FACT:**
More than 60% of emails are opened first on a mobile device.

**FACT:**
Conquest email reaches shoppers on their device of choice during their path to purchase.

**WHY CED:**
Trigger Data - Our ability to match consumers intent to purchase is unmatched. We receive a daily file of triggers for in market buyers who have visited specific websites with the past 24 hours in search of a RV.

Our trigger data allows us to generate sophisticated lists comprised of only the most recently active intenders interested in purchasing a RV.



**What Is OTT Advertising – Combine Precision Of Geofencing?**
For some time, RV Dealers have used Television advertising.  Many of those same dealers didn't have the budgets to advertise on TV Stations ranging from TBS to CBS in Prime Time.  Now, it's possible for those with and without TV budgets to advertise through Connected TV & Over The Top Devices

There are now an estimated **63 million "cord-cutters" and "cord-nevers"** in the US only reachable by Connected TV and digital channels.  STV provides dealers with a platform for engaging digital TV streamers with the level of precision you expect from all your campaigns: in-market audiences, demographics, offline behaviors and of course geofencing & household geofencing.



**FMT**
FACEBOOK MARKETPLACE TOOL

**Facebook Marketplace - Ready to find out what all the buzz is about?**

Facebook is hyper focused on making it's "Marketplace" a destination for consumers to buy RVs... and it's working.

Our fully managed service makes it easy.

Leads are generated on specific units and delivered via Facebook messenger or current chat provider

Listings are automatically removed for sold inventory

Available for Automotive, Powersports, Marine, RVs and Trailers

Easy to get started
Available to dealers in the
US and Canada





**LSO**
LOCAL SEARCH OPTIMIZATION

**Be Found, Trusted & Chosen**
Increase SEO, brand awareness & customer acquisition with one platform.

**The RV retail customer journey has changed. How?**
People expect relevant and engaging retail content on their smartphones and internet devices - across voice search, social media, and mobile apps.

**LSO helps detailers**
Across all their locations - reach and acquire more customers on the digital media and devices critical to RV selection.









### Data Management

Targeting the right audience with clean data leads to better performing campaigns.

### Omnichannel Marketing

We activate the audience with a consistent message through multiple channels.

### Engagement & Analytics

Engagement increases conversion. Analytics provides a scorecard.



Dealership Toolkit



Dealership Toolkit is a division of Coast Technology, LLC

813-644-3331
info@toolkit.email
Dealershiptoolkit.com